I. T. S. RUBBER CO. v. PANTHER RUBBER MFG. CO.

(Circuit Court of Appeals, First Circuit. May 26, 1919. Rehearing Denied July 23, 1919.)

No. 1383.

1. PATENTS ⊙⟶328—FOR MOLD FOR FORMING RUBBER HEELS VALID AND INFRINGED.

The Tufford patent, No. 1,177,833, for a mold for making rubber heels, *held* not anticipated and to disclose patentable invention; also infringed.

2. PATENTS ⊙⟶165—EFFECT OF FAILURE TO STATE MODE OF OPERATION OF DEVICE.

A patentee's failure to state in the patent the new mode of operation which his device in fact contains, and which produces a new and beneficial result, does not prohibit the court from taking these merits into consideration, in determining the scope of the invention or the validity of the patent.

3. PATENTS ⊙⟶167(1)—COURT MAY REFER TO SPECIFICATION TO CONSTRUE CLAIM.

Where the language of a claim includes elements described in general terms, the court may look to the specifications for the purpose of construing the language and ascertaining its meaning.

Appeal from the District Court of the United States for the District of Massachusetts; Frederic Dodge, Judge.

Suit in equity by the I. T. S. Rubber Company against the Panther Rubber Manufacturing Company. Decree for defendant, and complainant appeals. Reversed.

⊙⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

F. O. Richey, of Elyria, Ohio, and Charles A. Brown, of Chicago, Ill. (F. A. Tennant, of Boston, Mass., on the brief), for appellant.

Horace Van Everen, of Boston, Mass. (Burton W. Cary, of Boston, Mass., on the brief), for appellee.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

BINGHAM, Circuit Judge. [1] The plaintiff, the I. T. S. Rubber Company, is the owner of United States letters patent No. 1,177,833, issued to John G. Tufford, and complains of its infringement by the defendant, the Panther Rubber Manufacturing Company. The patent is for a mold for making rubber heels. There are 12 claims in the patent, but the only one in issue is No. 11, which reads as follows:

"A mold for forming heel lifts including assembled parts, one of which is provided with a·molding chamber having the general outline of a heel lift, one wall of the molding chamber being concave and the opposed wall of said chamber having a convex surface coacting with said concave wall, one of said walls being provided with washer supporting devices."

In the District Court it was held: (1) That the device was not patentably new as it was anticipated by the Nerger mold; (2) that, inasmuch as the claim in issue, by its terms, covered all concavo-convex molds whether the surfaces of the opposing walls were spherical or not, the claim was invalid; (3) that if the claim could be regarded as valid by being limited to the particular structure shown and described in the patent, the defendant's mold did not infringe ·it; and (4) if it could be regarded as valid without being thus limited, the defendant's mold did infringe.

The specification and claims as originally filed in the Patent Office related, not only to the mold to be employed in the manufacture of rubber heels, but to the method of acting upon the rubber to produce the heels. The claims for the method were later stricken out, and a patent was issued for the mold, but the description of the method was left in the specification.

In the specification the patentee declares:

"The object of the invention is to produce a resilient heel, which will have its attaching face concave throughout its area whereby, when the heel or lift is placed against the flat under surface of a leather or other shoe heel and pressure applied to the resilient heel or lift, a vacuum or suction cup may be formed whereby the heel or lift will be held to the shoe temporarily until the nails can be applied. A further object of the invention is to produce a heel which, when applied to a shoe, will have a flat tread surface, and which may be equipped with fastening devices so located that the heel can be easily trimmed down to a required size."

He further states that—

"The invention resides in certain novel features of a mold such as is illustrated in the accompanying drawings."

In the drawings he shows a base plate *1*, an intermediate plate *2*, and a top plate *3*, in which are co-operating instrumentalities whereby the complete heel is produced.

"The base plate *1* is provided in its upper surface with a recess or cavity *4* which is a true section of a sphere, and from the concave surface of which

rises pins 5 grouped near the deepest point or center of the recess or cavity and provided intermediate their ends with annular shoulders or supports 6. The intermediate plate or mold member 2 is formed on its under side with a convex projection, indicated at 7, of a curvature which will permit it to fit snugly in the concave recess or chamber 4 in the base plate. The upper face of the intermediate member 2 is provided with a circular depression or recess, indicated at 8, and this concave circular recess or depression aligns axially with the convex projection 7 on the under side of the plate. A central opening 9 is formed through the intermediate plate or mold member, and this opening 9 has an outline corresponding to the usual outline of a shoe heel or lift. The said intermediate plate or mold member is further provided in its upper face with a shallow circular overflow cavity or recess 10, the purpose of which will presently appear. The top plate or mold member 3 is provided on its under side with a convex projection 11 the convex surface of which is a true section of a sphere and an exact complement of the concave chamber or recess 4 and adapted to fit in the concave depression 8 of the intermediate member. Upon the apex or deepest portion of this convex projection 11, I provide ribs 12 which preferably define a space of the same shape as a shoe heel and extend parallel or concentric with the walls of the opening 9. Within the space so defined, I provide intersecting ribs 13, the purpose of which will presently appear.

"In the practice of the invention, the several plates or mold members are superimposed, * * * and to cause them to align with exactness the intermediate plate is provided on both its upper and lower surfaces with studs or lugs 14 adapted to engage openings or sockets 15 and 16 in the top plate and the base plate, respectively."

In preparing the mold for operation, the specification states:

"The base plate 1 and the intermediate plate 2 are assembled in their proper positions. * * * Small metallic washers, indicated at 18, are slipped over the ends of pins 5 so as to rest upon the shoulders 6 and project beyond the edges of said shoulders either before or after the said plates are assembled, and rubber or composition is then placed in the chamber formed by the cavity 4 and the opening 9 so as to completely fill the said opening. The top plate is then placed in position over the intermediate plate with its convex projection 11 entering the depression 8 and bearing directly upon the plastic mass in the opening 9. The plates are steam heated at all times so as to be maintained at a high temperature, and after the several plates or mold members are assembled, pressure is applied to the plates by means of a hydraulic press or other machine so that the plastic mass in the opening 9 will be compressed and solidified, the heat of the plates serving to vulcanize the mass to such an extent that it will be rendered very tough and durable but, at the same time, will retain its resiliency.

"After an interval sufficient to permit the desired vulcanization of the mass, the several plates are separated," and the heel is removed.

It is further stated that—

"The ribs 12 and 13 upon the top plate will * * * produce grooves in the upper face of the heel, and these grooves will mark off separate suction areas at the center of the heel, while, at the same time, the entire upper attaching face of the heel will form a suction area so that the heel may be readily placed in position upon a shoe and will set positively in its position while nails or other fastening devices are being driven through the openings formed by the pins 5"

and that—

"The heel produced * * * will have a concave attaching face and a convex tread face throughout its area and, when it is placed against a flat shoe heel, a sharp blow delivered thereon will flatten its opposite faces, so that the air contained between the attaching face of the rubber heel or lift and the leather surface of the shoe will be driven out, and the rubber heel or lift held to the shoe by the suction thus produced."

The evidence shows that in practice the device is operated as follows: Washers are placed upon the washer pins of the lower plate, forming what is termed a table; the intermediate plate is placed upon the bottom plate; a blank piece of rubber or composition, either circular in shape or having the general outline of a heel lift, and of sufficient volume to fill the cavity of the mold, is placed on the washer pins; the top plate is placed in position and held in alignment by the dowel pins shown in Fig. 1, so that the convex portion *11* engages the rubber; pressure is applied to the plates by means of an hydraulic press; the plates are kept steam heated at all times; and after a given time the pressure is released and again suddenly applied for the purpose of driving out the air and still further pressing and solidifying the material. The release and sudden application of the pressure is termed "bumping" and is repeated several times. This is the way in which the operator handles the mold, and is the way commonly pursued in the prior art, except that in operating the plaintiff's mold the bumping is repeated a greater number of times.

The evidence further shows, and we find, that the mode of operation peculiar to the plaintiff's device—that is, the treatment of the material by the mold—is as follows: The convex surface of the upper plate engages and forces itself into the center of the stock, driving the material toward the edges of the mold and trapping air beneath the stock and between it and the bottom of the cavity in the concave member of the mold; as the convex member is pressed further down, the trapped air resists the pressure and further tends to drive the material toward the edges; the pressure compresses and solidifies the plastic mass and the heat vulcanizes it; and as a result of this mode of operation the outer edges of the heel are rendered more dense but still retain their resilient qualities.

Rubber heels thus produced wear longer and are tougher and more durable at the edges. It is the air trapped in the cavity of the lower surface, acting in conjunction with other elements, that drives the material to the outer edges of the mold and there solidifies and compresses it. The mode of operation found to exist in the plaintiff's device does not depend upon the shape of the rubber blank at the time it is placed in the cavity of the mold, for it operates upon the stock in its plastic state and forces it to the outer edges of the mold. The essential characteristic of the rubber blank is that it shall be of sufficient volume to fill the cavity of the mold. It is at the edge of the heel that the greatest wear comes, and it is especially desirable to overcome this as far as possible and still keep the heel resilient. This result was accomplished in a substantial manner through the peculiar mode of operation of the plaintiff's device, and we think it involved invention.

[2] The patent is for a structure, and the plaintiff is entitled to the benefit of all the advantages which it possesses over the prior structures intended to accomplish a similar purpose; and the patentee's failure to state in the patent the new mode of operation which his device in fact contains, and which produces a new and beneficial result, does not prohibit the court from taking these merits into consideration

in determining the scope of the invention or the validity of the patent. Warren Steam Pump Co. v. Blake & Knowles Steam Pump Works, 163 Fed. 263, 277, 91 C. C. A. 19.

Another result accomplished was to give the heel the quality of closely attaching itself to a flat shoe heel by suction when placed against such heel and given a sharp blow. This was a beneficial result, as it did away with the necessity of using cement and excluded dirt and water, as the clinging effect continued after the heel was permanently affixed to the shoe with nails or other attaching means.

The proofs show that the heel produced by the mold met with immediate commercial success; that the number of heels manufactured a month in 1915 was 50,000; and at the time of the trial in May, 1917, about 100,000 a day, or 3,000,000 a month; that the number of molds in use increased from 13, with 600 cavities, in March, 1915, working 10 hours a day, to 68 molds, with 3,100 cavities, in May, 1917, working 22 hours a day; and that this was due to the merit of the article rather than business enterprise.

[3] It is contended on the part of the defendant that the claim in suit is invalid, that the words "concave" and "convex" are not limited in their application to surfaces which are spherical, and that so to limit the claim would be to read into it a new element. We recognize that it is not the province of the court to add to a claim an element not embraced within its language; but, where the language of a claim includes elements described in general terms, we understand that it is the province of the court, for the purpose of construing the language and ascertaining its meaning, to look to the specification. Bates v. Coe, 98 U. S. 31, 38, 25 L. Ed. 68; Stillwell-Bierce & Smith-Vaile Co. v. Eufaula Cotton Oil Co., 117 Fed. 410, 54 C. C. A. 584; Lamb Knit Goods Co. v. Lamb Glove & Mitten Co., 120 Fed. 267, 56 C. C. A. 547. The words "concave" and "convex," as applied to surfaces, in their more restricted and technical sense, mean surfaces every line of which and at every point are concave or convex, in the manner of a sphere (Century Dictionary), or of an eggshell (Webster's Standard Dictionary). They are also loosely used to define cavities or projections which do not possess concave or convex qualities throughout their surfaces. The meaning of the language employed in the claim being doubtful, we think resort may properly be had to the specification to ascertain the sense in which the words in question were used. The specification frees the matter from doubt, for there the concave and convex surfaces of the opposing walls are shown to be spherical throughout their areas.

The defendant further contends that the claim is anticipated by the prior art as shown in the mold of Nerger; but this is clearly not so when the claim is understood in the sense in which we have construed it. The surfaces of the opposing walls of the Nerger mold are not spherical, nor are they concavo-convex, in the more restricted meaning of the words. The line of the breast of the heel in both the upper and lower plates is, no doubt, concavo-convex across the heel; but no line drawn lengthwise of these plates possesses those qualities, and the outer edges of the surfaces are in the same plane throughout. On the

other hand, in the plaintiff's and the alleged infringing device of the defendant, the edges of the opposing surfaces at every point are concavo-convex. It is manifest that in the Nerger mold means for pocketing the air that will produce the mode of operation found in the plaintiff's device do not exist. We think, therefore, that neither the Nerger mold, nor any of the molds relied on in the prior art, anticipate the mold of the plaintiff.

It was found in the court below that the defendant's mold infringes claim 11 of the plaintiff's patent, if it could be regarded as valid without being limited to the particular structure shown and described in the patent. This claim does not embody certain special features shown and described in the specification pertaining to the upper and lower sides of the intermediate plate. These are mere details of construction, and not essential, as other means well known in the art may be employed. The essential means for producing this mode of operation are set out in the claim, and, as we regard it as valid, we have no hesitation in finding that it is infringed by the defendant's mold, the curvature of whose opposing surfaces are spherical throughout their areas and are mathematically the same.

The decree of the District Court is reversed, and the case is remanded to that court for further proceedings not inconsistent with this opinion, with costs in this court to the appellant.